**Lyle RIDOUT, Plaintiff,**

v.

**JBS USA, LLC, a/k/a Swift Beef Company, Defendant.**

No. 4:11–CV–174.

United States District Court,
S.D. Iowa,
Central Division.

Aug. 20, 2012.

Gene R. La Suer, Davis Brown Koehn Shors & Roberts PC, Des Moines, IA, W.V. Bernie Siebert, Sherman & Howard LLC, Denver, CO, for Defendant.

John O. Haraldson, Sellers, Haraldson & Binford, Des Moines, IA, for Plaintiff.

## ORDER

ROBERT W. PRATT, District Judge.

Before the Court is a Motion for Summary Judgment, filed May 31, 2012, by JBS USA, LLC, a/k/a Swift Beef Company ("Defendant"). Clerk's No. 16. Lyle Ridout ("Plaintiff") filed a resistance to the Motion on July 2, 2012. Clerk's No. 19. Defendant filed a reply on July 9, 2012. The matter is fully submitted.[1]

## I. FACTS

Defendant owns a pork processing plant in Marshalltown, Iowa. Pl.'s State of Facts in Supp. or Resistance to Def.'s Mot. for Summ. J ("Pl.'s Facts") ¶ 1 (Clerk's No. 19–1). Plaintiff was hired by Defendant's predecessor in interest in or around 1969, and was continually employed with Defendant for a period of approximately forty-one years. Def.'s Statement of Material Facts (Clerk's No. 16–2) ("Def.'s Facts") ¶ 1. At the time of his termination, Plaintiff was 62 years old and was employed as the Rendering Superintendent. Pl.'s Facts ¶ 3; Def.'s Facts ¶ 2. In this position, Plaintiff supervised employees and oversaw the operation of the equipment in the Rendering department. Def.'s Facts ¶ 4. Plaintiff was supervised in this role by Plant Engineer Cyril Thill ("Thill"), who had been employed by Defendant for over forty years; Plant Manager Todd Carl ("Carl"), age 42; and General Manager Troy Mulgrew ("Mulgrew"), age 48. Id. ¶¶ 5–8.

On May 13, 2010, a piece of equipment in the Rendering department known as the "Prehogor" failed because "the hammers that draw the product in had worn down substantially to where it was no longer effective." Id. ¶ 9. Operations personnel (including the Rendering Supervisor and Rendering Superintendent) and maintenance personnel shared joint responsibility for this equipment failure. Id. ¶ 10. According to Mulgrew, he went to the Rendering department early in the morning on May 14, 2010, because the Prehogor failure "was backing up 50,000 pounds per hour of product. Anytime there's a major failure, I go look." Id. ¶ 11. Carl went to Plain-

---

1. In the body of Plaintiff's resistance, Plaintiff requests oral argument on Defendant's Motion. *See* Clerk's No. 19 at 2. Plaintiff's counsel is reminded that the Local Rules require requests for oral argument to be "noted separately in *both* the caption and the conclusion of the motion or resistance to the motion and must be supported by a showing of good cause." L.R. 7(c) (emphasis added). Regardless, the Court does not believe that oral argument will substantially aid it in resolving the present matter.

tiff's office and requested that Plaintiff join Carl, Mulgrew, and Thill a few yards from the Prehogor to discuss the equipment failure.[2] *Id.* ¶ 12.

The parties disagree over precisely what happened next, or more specifically, how it should be characterized. Mulgrew testified that when Carl tried to ask Plaintiff some questions about the "who, what, when, where, and why" of the Prehogor failure, "it was obvious [Plaintiff] was not listening" and that he "was visibly upset to the point of raising his voice," stating something like, "You come down here. We got shit up to our necks, now you want to start pointing fingers at us?" Def.'s App. at 53–54 (Mulgrew Dep.). Mulgrew testified that, in response to being asked when he had last looked at the Prehogor, Plaintiff replied that it was "maintenance's job." Mulgrew further testified:

A. I believe [Carl] was still trying to reason with [Plaintiff] because he was very upset. I let [Carl] try to reason. It was obvious Doug wasn't listening to today's efforts and that's when I interjected and said, "Take it down a couple notches. Doug, do yourself a favor or you're going home," and [Plaintiff] responded . . . "I'm not going home or I'm not going fucking home. You're going to have to kick me the fuck out of here," somewhere along those lines is what I recall. And then I repeated, "Tone it down or you're going home."

Q. What happened next?

A. I believe [Plaintiff] left.[3]

*Id.* at 55–56. Thill testified that Plaintiff was the only one yelling during this meeting near the Prehogor. Def.'s App. at 78.

Although Plaintiff admits that this meeting near the Prehogor took place, he claims that it "was loud in the area in which this conversation took place as the men were standing close to the operating centrifuge, presser, and prehogor and it was difficult to hear." Pl.'s Resp. to Def.'s Statement of Material Facts ("Pl.'s Resp.") ¶ 13 (Clerk's No. 19-2). Plaintiff contends that noise in the plant requires people to "speak up just to be hear[d]" generally, but that this is especially true "when you are 12 to 15 feet from the prehogor." *Id.* Moreover, Plaintiff notes that he has "substantial hearing loss due to his years working at the plant making it difficult to hear or speak loudly to be heard as a result of this hearing loss." *Id.* Plaintiff further states:

After the Plaintiff said that the maintenance department was responsible for repairs, the Plaintiff believes—as it was hard to hear—that [Mulgrew] told him to "tone it down a couple of octaves or he's going to be sent home." Plaintiff admits that he was frustrated and could not understand why these individuals were present as the prehogor had over many other years broken down and needed repairs before and he and his subordinates were working very hard to overcome the build up that resulted from the shutdown. The Plaintiff did not think he was being aggressive on the morning of May 14, 2010, just loud. [Carl] stated on May 25, 2010, that the

---

**2.** According to Plaintiff, he was in the Rendering office filling out daily reports when Carl came in, indicated to him that Mulgrew was upset, and stated that "it would behoove [Plaintiff] to come out to the prehogor." Pl.'s Facts ¶¶ 30–32.

**3.** Plaintiff claims that he went home because Mulgrew told him, "Go home, go home, go home." Pl.'s Facts ¶¶ 45–46.

Plaintiff only seemed "a little aggressive and defensive."

*Id.* ¶ 14.

Regardless of how the conversation near the Prehogor occurred, it appears that Mulgrew suspended Plaintiff without pay, effective May 14, 2010, and Cheryl Hughlette ("Hughlette"), Defendant's Human Resources Manager, contacted Plaintiff to request that he provide a statement regarding the events that occurred on that date. *See* Def.'s Facts ¶ 18; Def.'s App. at 86; Pl.'s Facts ¶ 47. In an e-mail chain between Hughlette, Thill, Mulgrew, Carl, and Tony Harris ("Harris"), Head of Human Resources for Defendant's pork division, Harris asked the others to "[p]lease consider the facts and [send] me your recommendations concerning [Plaintiff's] continued employment." Def.'s App. at 79. In response, Mulgrew stated that it is "up to [Carl] and [Thill]."[4] *Id.* Carl responded that "it would be nice to hear [Plaintiff's] explanation to the incident." *Id.*

On May 25, 2010, Plaintiff met with Carl, Harris, and former Human Resources Director Joe Nevel ("Nevel") to discuss the May 14, 2010 incident.[5] Def.'s Facts ¶ 26. Plaintiff provided the following deposition testimony about the meeting:

Q. And you said at the meeting on the 25th that—you said if you'd been [Mulgrew], you would have sent you home too. What was it that you said or did that would have caused you to send yourself home if you would have been [Mulgrew]?

A. When you get into a situation where there's a no-win, you're talking with a person and you just need to send that person home and handle it another day. That's how I would have done it.

Q. In that meeting on the 25th, did you also tell Mr. Carl and Mr. Harris, Mr. Thill, that you had been—you thought you'd been disrespectful to [Mulgrew]?

A. I did.[6]

Def.'s App. at 13–14. During the meeting, Plaintiff also brought up the fact that two other "older" employees, Linn Knox ("Knox") and Dean Welton ("Welton"), had been discharged.[7] Def.'s Facts ¶¶ 29–30.

---

4. Mulgrew testified that he had not "made up [his] mind" about whether Plaintiff should be terminated at the time of this response, but that he believed "[t]hat it would be difficult to continue with [Plaintiff] in charge of [the] rendering department ... [b]ecause of the event that took place and events that led to that." Def.'s App. at 58 (Mulgrew Dep.). Mulgrew claims that he did not express this opinion to anyone, however, prior to Plaintiff's termination. *Id.* at 59.

5. Plaintiff states that he was fearful of losing his job and stated at the May 25, 2010 meeting that he was remorseful about the May 14, 2010 incident, that he should have handled it differently, and that he was devoted to the company and wanted to return to work. Pl.'s Facts ¶ 70. He also told the other participants in the meeting that if he was not permitted to remain Rendering Superintendent, he would work in whatever job Defendant need him in. *Id.* ¶ 71.

6. Regarding this testimony, Plaintiff denies a Statement of Material Fact proffered by Defendant which states, "Plaintiff admitted he had been disrespectful to Mulgrew on May 14, 2010." *See* Def.'s Facts ¶ 28. In denying the statement, Plaintiff appears to contend that the question about being disrespectful was merely a summary of Nevel's notes of the May 25 meeting, which reflect Plaintiff being asked if he thought he "was being aggressive or just loud" on May 14, 2010, and Plaintiff's reply that he thought he "was just loud but I may have come across as a little aggressive to [Mulgrew]." Pl.'s Resp. ¶ 28.

7. According to Defendant, both Knox and Welton were terminated for safety violations. Def.'s Facts ¶¶ 31–32. Specifically, Harris testified:

[Mulgrew terminated Welton because] he had a history of accidents and with the, what we call the lull, this large piece of equipment, backing into things, knocking,

Harris, believing that Plaintiff was "framing it up to say this is about [ ] age," told Plaintiff that age had nothing to do with his investigation. Def.'s Facts ¶ 29; Def.'s App. at 44.

After the meeting, Harris "shared the issue with those involved" and a decision regarding Plaintiff's employment was "made at the plant level." [8] Def.'s Facts ¶ 33. During these plant level conversations, Harris claims that he did not discuss Plaintiff's long-term historical performance with Mulgrew or Carl because "they were concerned with current events." Id. ¶ 35. In particular, Harris says that the discussion "centered around current events and everything that led up to this event that was unacceptable behavior.... The issue was the current event on the 14th and activities leading up to that." Id. ¶ 36. Nonetheless, Mulgrew and Carl both testified that they expressed to Harris that Plaintiff had "resisted changes in the rendering department, resisted working with [a consultant brought in to recommend improvements in the Rendering department, and] basically was not working to improve the process or attempting to im-prove the process and was frustrating the improvements." [9] Id. ¶ 40. Carl further stated that he believed Plaintiff's performance was declining leading up the May 14, 2010 incident,[10] but that he did not form the opinion that Plaintiff should be fired until "two to three weeks after [May 14] and sitting in on numerous meetings and conversations with multiple people." Id. ¶¶ 41, 44; Pl.'s App. at 79 (Carl Dep.). Mulgrew stated that he believed Plaintiff had performance deficiencies prior to the incident and documented his perceptions in an email to Hughlette on May 14, 2010. Def.'s Facts ¶ 43; Def.'s App. at 87. Prior to Plaintiff's termination, his last performance evaluation, for fiscal year 2007, was conducted by Thill in January 2008. Pl.'s Facts ¶ 8; Def.'s Reply to Pl.'s Facts ("Def.'s Resp.") ¶ 5. Thill gave Plaintiff a score of 3.63 on a 5 point scale, equating to "meets expectations." Def.'s Facts ¶ 45. At deposition, however, Thill noted that, since the evaluation, a culture change had occurred at the plant, and that Plaintiff's performance was not entirely acceptable in light of the "expectations of our new com-

---

almost knocking a structure down and several things like that, had actually been suspended and was being considered for termination, was then allowed to return to work and then found again driving it, jeopardizing his own safety without wearing his seat belt and having the roll bar up on a lawn mowing or some kind of equipment in violation of the safety policies.... Def.'s App. at 45–46 (Harris Dep.). Thill testified that Knox was terminated for "safety violations," namely for "[p]utting a process heater inside of a small room and setting the sprinkler system off." Id. at 76–77 (Thill Dep.). Plaintiff disputes that Knox and Welton were terminated for these reasons, pointing to Welton's belief that Mulgrew scrutinized him more heavily with the purpose of terminating him because of age, and Knox's affidavit, stating that Mulgrew's unreasonable expectations made errors more likely, Mulgrew was only short on patience with older employees, and Knox believes that he was terminated on the basis of his age. See Pl.'s Resp. ¶¶ 31–32.

8. Harris testified that "[i]t's always the team at the plant that reviews, makes the recommendation, and the general manager has veto power or the final say." Def.'s Facts ¶ 34; Def.'s App. at 35–36. Harris claims to have veto power over the General Manager. Def.'s Facts ¶ 34; Def.'s App. at 36.

9. Plaintiff denies that he was resistant to change or to working with the consultant. Pl.'s Resp. ¶ 40. Thill could not recall any specifics of how Plaintiff was "resistant to 'suggestions' of the consultant." Pl.'s Facts ¶ 79.

10. Carl recalled problems with Plaintiff's "[p]erformance related to profitability, follow-up, consistency, communication, participation." Def.'s Facts ¶ 42.

pany [which] is a higher standard than what—we've ever been used to." *Id.* ¶ 46.

Regarding the May 14, 2010 incident, Harris stated that his understanding was that Plaintiff's behavior on May 14 was unacceptable because there was "an attempt to resolve a problem, to better understand a breakdown issue" and Plaintiff "overreacted ... and instead of cooperating, became argumentative and disrespectful to Mr. Mulgrew."[11] *Id.* ¶ 37. Mulgrew testified that he believed Plaintiff was out of line on May 14.[12] *Id.* ¶ 38. Thill testified that he had seen supervisors engage in verbal altercations, but could not recall whether any of them had been fired. Pl.'s App. at 47. He further testified that the May 14, 2010 incident was "heated" and that he had seen other heated incidents, but that he could not recall anyone being fired for such an incident. *Id.* Finally, Thill testified that he had never seen anyone other than Plaintiff engage in this type of conduct toward the General Manager, particularly when other supervisory staff were present. Def.'s App. at 78.

Ultimately, Mulgrew, Carl, and Thill determined that Plaintiff should be terminated. Def.'s Facts ¶ 47. According to Defendant, the breakdown of the Prehogor did not directly relate to the termination; rather, the termination was due to Plaintiff's behavior during the May 14, 2010 meeting, coupled with his declining performance. *Id.* ¶ 48. On May 28, 2010, Harris "inform[ed] [Plaintiff] that the deci-sion was made that he be terminated and it all resulted around the culmination of activities on the 14th and his performance leading up to that point." *Id.* ¶ 49. Plaintiff, however, thought he "was discharged because of the 14th and not because of [his] performance," and Plaintiff recalls Harris telling him on May 28, 2010 that "the committee had decided that [Plaintiff] no longer fit into the scheme, in the direction that the company was headed."[13] *Id.* ¶¶ 50–51. In a decision made by a group with final approval from the Human Resources Manager and Mulgrew, Plaintiff was terminated and replaced as Rendering Supervisor by Chad Richett, who is approximately 35 to 38 years old.[14] *Id.* ¶¶ 53–55. Plaintiff filed the present suit asserting a claim for age discrimination in violation of the Iowa Civil Rights Act ("ICRA") in the Iowa District Court for Marshall County on March 10, 2011. Clerk's No. 1–3. Defendant removed the matter to federal court on April 13, 2011. Clerk's No. 1. Plaintiff thereafter filed an Amended Complaint, adding a claim for violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. Clerk's No. 15.

## II. STANDARD FOR SUMMARY JUDGMENT

The term "summary judgment" is something of a misnomer. *See* D. Brock Hornby, *Summary Judgment Without Illu-*

---

**11.** Plaintiff denies that he was uncooperative or disrespectful to his supervisors on May 14, 2010. Pl.'s Resp. ¶ 37.

**12.** Plaintiff denies being "out of line" and emphasizes that Mulgew's reaction "was part of a pattern of judging older employees more harshly and using events—having looked for them—to terminate older employees such as the Plaintiff." Pl.'s Resp. ¶ 38.

**13.** Defendant argues that "[a]ny statement that may have been made about Plaintiff not fitting in 'would have been with regards to the behavior, the attitude, the work performance was not acceptable, would not fit into the organization.'" Def.'s Facts ¶ 52 (quoting Harris Dep.).

**14.** After approximately one and one-half years, Chad Richett was demoted back to Rendering Supervisor, the position he held before becoming Rendering Superintendent, due to performance issues. Pl.'s Facts ¶¶ 96–97.

*sions,* 13 Green Bag 2d 273 (Spring 2010). It "suggests a judicial process that is simple, abbreviated, and inexpensive," while in reality, the process is complicated, time-consuming, and expensive.[15] *Id.* at 273, 281. The complexity of the process, however, reflects the "complexity of law and life." *Id.* at 281. "Since the constitutional right to jury trial is at stake," judges must engage in a "paper-intensive and often tedious" process to "assiduously avoid deciding disputed facts or inferences" in a quest to determine whether a record contains genuine factual disputes that necessitate a trial. *Id.* at 281–82. Despite the seeming inaptness of the name, and the desire for some in the plaintiffs' bar to be rid of it, the summary judgment process is well-accepted and appears "here to stay."[16] *Id.* at 281. Indeed, "judges are duty-bound to resolve legal disputes, no matter how close the call." *Id.* at 287.

Federal Rule of Civil Procedure 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."[17] "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has estab-lished his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.,* 541 F.2d 207, 209 (8th Cir.1976) (citing *Windsor v. Bethesda Gen. Hosp.,* 523 F.2d 891, 893 n. 5 (8th Cir.1975)). The purpose of summary judgment is not "to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broad. Sys., Inc.,* 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). Rather, it is designed to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.,* 545 F.2d 1127, 1129 (8th Cir.1976) (citing *Lyons v. Bd. of Educ.,* 523 F.2d 340, 347 (8th Cir.1975)). Summary judgment can be entered against a party if that party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *See*

---

**15.** Indeed, Judge Hornby, a District Court judge for the District of Maine, convincingly suggests that the name "summary judgment" should be changed to "motion for judgment without trial." 13 Green Bag 2d at 284.

**16.** Judge Hornby notes that over seventy years of Supreme Court jurisprudence gives no hint that the summary judgment process is unconstitutional under the Seventh Amendment. *Id.* at 281 (citing *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 336, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) and *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). While he recognizes that not much can be done to reduce the complexity of the summary judgment process, he nonetheless makes a strong case for improvements in it, including, amongst other things, improved terminology and expecta-tions and increased pre-summary judgment court involvement. *See id.* at 283–88.

**17.** Federal Rule of Civil Procedure 56 was revised effective December 1, 2010. The revised rule does not change the substantive standard for summary judgment. *See* Fed. R.Civ.P. 56 advisory committee's note ("Rule 56 is revised to improve the procedures for presenting and deciding summary-judgment motions and to make the procedures more consistent with those already used in many courts. The standard for granting summary judgment remains unchanged."); *see also Seacor Holdings, Inc. v. Commonwealth Ins. Co.,* 635 F.3d 675, 680 n. 8 (5th Cir.2011) ("The amended rule contains no substantive change to the standard."). All references in this Order to Rule 56 refer to the current version of the rule, unless otherwise noted.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment upon motion after there has been adequate time for discovery. Summary judgment is appropriately granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and that the moving party is therefore entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir.1994). The Court does not weigh the evidence, nor does it make credibility determinations. The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers,* 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.") (citing *Weight Watchers of Quebec, Ltd. v. Weight Watchers Int'l, Inc.,* 398 F.Supp. 1047, 1055 (E.D.N.Y. 1975)).

In a summary judgment motion, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. If the moving party has carried its burden, the nonmoving party must then go beyond its original pleadings and designate specific facts showing that there remains a genuine issue of material fact that needs to be resolved by a trial. *See* Fed.R.Civ.P. 56(c). This additional showing can be by affidavits, depositions, an-

swers to interrogatories, or the admissions on file. *Id.; Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

Courts do not treat summary judgment as if it were a paper trial. Therefore, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994). In a motion for summary judgment, the Court's job is only to decide, based on the evidentiary record that accompanies the moving and resistance filings of the parties, whether there really is any material dispute of fact that still requires a trial. *See id.* (citing *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505 and 10 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2712 (3d ed.1998)).

### III. LAW AND ANALYSIS

 "The ADEA makes it unlawful for an employer to discriminate against an employee on the basis of the employee's age." *Calder v. TCI Cablevision of Mo., Inc.,* 298 F.3d 723, 728 (8th Cir.2002) (citing 29 U.S.C. § 623(a)(1)). An age discrimination claim under Iowa Code Chapter 216 generally applies the same legal analysis set forth for a federal ADEA

claim. *Regel v. K–Mart,* 190 F.3d 876, 878 (8th Cir.1999) ("We apply the same analysis to the appellants' age discrimination claims under the ADEA and under Iowa Code §§ 216.6."). Where, as here, the parties agree there is no direct evidence of discrimination, courts apply the " 'basic tripartite pattern of proof (prima facie case—rebuttal—pretext)' as set forth in *McDonnell Douglas Corp. v. Green." Beshears v. Asbill,* 930 F.2d 1348, 1353 (8th Cir.1991) (citing 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); 3A A. Larson & L. Larson, Employment Discrimination, § 102.41 at 21–284 (1991)). To establish a prima facie case of age discrimination, Plaintiff must demonstrate: (1) that he is at least 40 years old, (2) that he was terminated, (3) that he was meeting his employer's reasonable expectations at the time of his termination, and (4) that he was replaced with an individual who was substantially younger. *Haigh v. Gelita USA, Inc.,* 632 F.3d 464, 468 (8th Cir.2011) (citing *Roeben v. BG Excelsior Ltd. P'ship,* 545 F.3d 639, 642 (8th Cir.2008)); *see also Sievers v. Iowa Mut. Ins. Co.,* 581 N.W.2d 633, 639 (Iowa 1998). Once Plaintiff has satisfied the burden to show a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Haigh,* 632 F.3d at 468. If the employer satisfies its burden, then the rebuttable presumption of discrimination raised by the Plaintiff's prima facie proof drops from the case and, once again, the burden shifts to Plaintiff to prove by a preponderance of the evidence that the employer's stated reasons are mere pretext for discrimination. *Id.; St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 508, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). "The plaintiff retains at all times the ultimate burden of persuading the trier of fact that the adverse employment action was motivated by intentional discrimination." *Rothmeier v. Inv. Advisers, Inc.,* 85 F.3d 1328, 1332 (8th Cir.1996).

### A. *Prima Facie Case*

■ Defendant does not dispute that Plaintiff is at least 40 years old, was terminated, and was replaced in his position as Rendering Superintendent by a substantially younger individual. Rather, Defendant contends that Plaintiff fails the first step of the *McDonnell Douglas* analysis because he cannot demonstrate the third element of a prima facie case—that he was meeting his employer's reasonable expectations at the time of his termination. Defendant argues that "Plaintiff was uncooperative, frustrated improvements that needed to be made in the Rendering department, and was defensive and disrespectful on several occasions," and that "Plaintiff was repeatedly coached regarding these issues and his management style." Def.'s Br. at 7. Moreover, Defendant argues that "Plaintiff's inappropriate and unprofessional behavior on May 14, 2010 undermines any argument by Plaintiff that he was meeting Defendant's legitimate expectations at the time of his termination." *Id.* at 8.

Defendant cites *Erenberg v. Methodist Hospital* in support of its position. 357 F.3d 787 (8th Cir.2004). In *Erenberg,* the Eighth Circuit affirmed the district court's grant of summary judgment in favor of Methodist hospital, finding that the plaintiff had failed to prove a prima facie case of age discrimination because she had not shown she was qualified for her position because she was not meeting the employer's reasonable expectations. *Id.* at 793. In particular, the Court of Appeals found that Methodist had identified deficiencies in the plaintiff's work performance, communicated those findings to the plaintiff on a regular basis, and that the plaintiff was, therefore, "aware that she was not performing her duties in a way that met Methodist's legitimate expectations." *Id. Erenberg,* however, is clearly distinguishable. In that case, the plaintiff began her

employment in August 1998 and quickly began having trouble. *Id.* at 789. Within her first two months, the plaintiff had received numerous complaints, been absent on several occasions, and been counseled twice and moved once in an attempt to correct the problems. *Id.* In the following months, however, the plaintiff incurred two written warnings for absenteeism, with the second written warning also alleging a variety of job performance deficiencies. *Id.* In September 1999 alone, Methodist received seventeen separate complaints regarding the plaintiff's job performance. *Id.* By the time her employment was terminated in December 1999, the plaintiff had been given a third written warning with a three day suspension, yet continued to accumulate complaints and to have a high absenteeism rate. *Id.*

In sharp contrast to *Erenberg,* Defendant has not identified a single document prepared prior to the Prehogor incident that would support its claims that Plaintiff was ever "coached" regarding his management style or regarding defensiveness, uncooperativeness, or disrespectfulness. Indeed, the *only* support Defendant provides for Plaintiff's alleged lackluster performance and coaching thereon prior to May 14, 2010, is memos from Mulgrew and Thill to Hughlette dated *after* Plaintiff had left Defendant's facility due to the Prehogor incident.[18] *See* Def.'s Br. at 7 (citing Def.'s App. at 87 (a memo from Mulgrew to Hughlette dated May 14, 2010 at 2:33 p.m.) and 88 (a memo from Thill to Hughlette dated May 15, 2010)). Moreover, to the extent that Mulgrew and Thill claim that Plaintiff's performance had become an issue, Plaintiff denies it. *See, e.g.,* Pl.'s Resp. ¶ 41 ("Plaintiff denies, however, his performance was 'on the downward.'"). Thus, the Court finds that the present case does not present sufficient undisputed facts to conclude as a matter of law that Plaintiff was not meeting his employer's reasonable expectations. Plaintiff has satisfied his obligation to state a prima facie case of age discrimination.[19]

---

18. The other two cases cited by Defendant are also factually distinguishable. In *Orluske v. Mercy Medical Center,* the plaintiff had been given several poor performance reviews over a period of eighteen months, and the court relied on *Erenberg* to conclude that the prima facie case failed because, unlike in the present case, *there was no dispute* that plaintiff had "numerous incidents of misconduct over eighteen months prior to [her] termination, all of which were communicated to [her]." 455 F.Supp.2d 900, 916 (N.D.Iowa 2006). Likewise, in *Moyer v. DVA Renal Healthcare, Inc.,* the plaintiff failed to make a prima facie case of discrimination where she "admittedly failed on a number of occasions to abide by DVA's policy on infection control and unprofessional conduct." 368 Fed.Appx. 714, 717 (8th Cir.2010).

19. Given the option, the Court would reject the *Erenberg* standard in favor of that articulated in *McGinnis v. Union Pacific Railroad,* where a different panel of the Eighth Circuit rejected a finding by the district court that a twenty-eight year railroad employee was not qualified for his position:

[T]he district court incorrectly applied the prima facie case standard by requiring a heightened standard for [the plaintiff] to establish he was qualified for the position. The district court stated, "the court has already determined that the numerous safety violations are sufficient to show that [the plaintiff] did not meet the qualifications for his job." As previously indicated, [the plaintiff] was employed for twenty-eight years before his discharge and did not receive any citations for violating work rules in his first twenty-three years of employment. As to the qualification prong, the district court's approach, in a sense, required [the plaintiff] to disprove the reasons given for his discharge rather than requiring him to establish a prima facie case-short-circuiting the analysis under the *McDonnell Douglas* framework. *Slattery* [*v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 92 (2d Cir.2001) ] ("The qualification prong must not ... be interpreted in such a way as to shift onto the plaintiff an obligation to anticipate and disprove, in his prima facie case, the employer's proffer of a legitimate, non-discriminatory basis for its decision.").

## B. Employer's Proffered Reason for Termination & Whether Plaintiff has Shown Pretext

■■ Defendant has offered two slightly different legitimate, nondiscriminatory reasons for Plaintiff's termination. Def.'s Br. at 2 ("Defendant terminated Plaintiff because of his unacceptable and unprofessional behavior on May 14, 2010."); Def.'s Br. at 18 ("Defendant has articulated a legitimate, non-discriminatory reason for [Plaintiff's] termination: his insubordinate and aggressive behavior toward management on May 14, 2010, coupled with his declining performance."). Thus, the Court turns its attention to the third stage of the *McDonnell Douglas* analysis. Notably, this third phase of the analysis requires a somewhat lower standard of proof under the ICRA than it does under the ADEA. Under the ADEA, a plaintiff must "present evidence, that considered in its entirety (1) creates a fact issue as to whether the defendant's proffered reasons are pretextual and (2) creates a reasonable inference that age was a *determinative* factor in the adverse employment decision." *Tusing v. Des Moines Indep. Cmty. Sch. Dist.*, 639 F.3d 507, 515–16 (8th Cir.2011) (emphasis added) (discussing *Gross v. FBL Fin.*

*Servs., Inc.*, 557 U.S. 167, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009) and quoting *Wingate v. Gage Cnty. Sch. Dist., No. 34*, 528 F.3d 1074, 1079 (8th Cir.2008)). Under ICRA, however, the plaintiff must "prove only that age was a *'motivating* factor' in-and not necessarily 'the only reason' for—the employer's decision." *Id.* (emphasis added) ("In a 'pretext' case ... the Iowa Supreme Court's interpretation of the ICRA arguably creates a lower standard than the Supreme Court's interpretation of the ADEA.") (quoting *DeBoom v. Raining Rose, Inc.*, 772 N.W.2d 1, 12–13 (Iowa 2009)).

Plaintiff argues that he has satisfied either the ICRA or the ADEA standard of pretext because he has offered evidence undermining Defendant's claim that he was terminated due to the May 2010 Prehogor incident, namely that Thill recalled other heated conversations at the plant, but none that led to termination; Harris admitted that arguments and cursing were not uncommon on the plant work floor and were rarely, if ever punished; the noise level in the Rendering Department is loud and requires speaking up just to be heard; and Mulgrew never believed that Plaintiff was invading his personal space. Pl.'s Br.

---

496 F.3d 868, 875 n. 3 (8th Cir.2007). In *McGinnis*, the Court further stated that the qualification prong requires a plaintiff to show merely that " 'he possesses the basic skills necessary for performance of the job,' not that he was doing it satisfactorily." *McGinnis*, 496 F.3d at 874 n. 2 (quoting *Slattery*, 248 F.3d at 92). Indeed, in this case, Plaintiff worked for Defendant for 41 years. To now say that he was unqualified for his position due to events documented only *after* his termination or due to the particular event that allegedly justified his termination simply defies logic and is inconsistent with *McDonnell Douglas*. *See Haigh v. Gelita USA, Inc.*, 632 F.3d 464, 469–70 (8th Cir.2011) (declining to resolve the conflict, but noting, "We are of the view that the reasoning in *McGinnis* is more sound under the burden-shifting framework because the plaintiff should not be

tasked with anticipating and disproving his employer's reasons for termination during his prima facie case.").

Despite the Court's belief that *McGinnis* provides a more legally sound standard, it is nonetheless bound to follow *Erenberg*. In September 2011, the Eighth Circuit, sitting en banc, rejected the long-standing rule in this circuit that, when faced with conflicting panel opinions, courts are free to choose which line of cases to follow, stating, "We definitively rule today, in accordance with the almost universal practice in other federal circuits, that when faced with conflicting panel opinions, the earliest opinion must be followed 'as it should have controlled the subsequent panels that created the conflict.' " *Mader v. United States*, 654 F.3d 794, 800 (8th Cir.2011) (en banc) (internal citations omitted).

at 21. Plaintiff further argues that Defendant has presented no evidence of declining performance because Thill never gave Plaintiff a bad evaluation and because his last review, for fiscal year 2007, showed that Plaintiff "meets expectations." *Id.*

Plaintiff contends that there is substantial evidence that the actual reason for Plaintiff's discharge was his age. In particular, Plaintiff points out that Harris told Plaintiff that his termination was due to the fact that he "didn't fit into the scheme, the direction the company was headed"; Thill referenced a "culture change" due to new ownership; and Thill was supposed to provide annual reviews of Plaintiff, but did not conduct any since the "meets expectations" review performed in January 2008. *Id.* at 22. Plaintiff urges that his own termination fit a pattern that existed in the company in 2010, i.e., that at least two other employees in their sixties were also terminated under conditions giving rise to an inference of discrimination. *Id.* Sixty-four year old Knox claimed to have a good relationship with Mulgrew's predecessor, but contended that Mulgrew set unattainable and reckless deadlines for completion of projects, and was short of patience with older employees, but not with younger employees. *Id.* Likewise, sixty-six year old Welton stated his impression that when Mulgrew took over, older employees were more closely scrutinized and were punished more severely for offenses than were younger employees. *Id.* at 23.

Finally, Plaintiff argues that who Defendant chose to succeed him undercuts Defendant's claim that Plaintiff was terminated for insubordinate behavior and declining performance, citing the fact that Plaintiff was replaced by a younger, less-qualified employee, Richett. And, when Richett was terminated, Defendant replaced him with another younger employee, Holden, who had been terminated five years earlier for racially offensive conduct. *Id.* ¶¶ 23–24 ("It strains credulity for the same individuals who terminated [Plaintiff] for being insubordinate [to] then hir[e] someone who had previously been terminated for racially offensive conduct. If [Plaintiff] no longer fit in to the 'scheme of the company' one wonders just what 'scheme' the company desired to have, if Mr. Richett and Mr. Holden are preferred as somehow more qualified and less insubordinate?").

■■■ To sufficiently show that Defendant's asserted legitimate, nondiscriminatory reasons for Plaintiff's discharge are mere pretext for age discrimination, "the plaintiff's evidence must go beyond the establishment of a prima facie case to support a reasonable inference regarding the alleged illicit reason for the defendant's action." [20] *Landon v. N.W. Airlines, Inc.,* 72 F.3d 620, 624 (8th Cir.1995). Here, even accepting as true that Defendant's reasons for Plaintiff's termination were pretextual, i.e., that it did not *really* terminate Plaintiff's employment for declining performance and the May 2010 Prehogor incident, Plaintiff has not presented sufficient evidence to permit a reasonable fact-finder to infer that the *actual* reason for his termination was motivated by or determined by age discrimination.

To show pretext, Plaintiff relies first on the fact that he was replaced by Richett, a substantially younger employee. The

---

**20.** Abrogating a plethora of case law in this Circuit indicating that summary judgment should be used "sparingly" in employment discrimination cases, the Eighth Circuit explicitly held in 2011 that "district courts should not 'treat discrimination differently from other ultimate questions of fact.'" *Torgerson v. City of Rochester,* 643 F.3d 1031, 1043 (8th Cir.2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

Eighth Circuit has held, however, that while such a fact is "necessary to establish a prima facie case," evidence of replacement by a substantially younger employee "possess[es] 'insufficient probative value to persuade a reasonable jury that [plaintiff] was discriminated against.'" *Carraher v. Target Corp.*, 503 F.3d 714, 719 (8th Cir. 2007) (quoting *Nelson v. J.C. Penney Co., Inc.*, 75 F.3d 343, 346 (8th Cir.1996)).

Plaintiff attempts to bolster his pretext argument by presenting affidavits by Knox and Welton indicating that older employees were treated differently than similarly situated younger employees. *See* Pl.'s Br. at 23 ("The experience of Knox and Welton, as older employees in being monitored and treated more harshly than other, younger, employees matched that of [Plaintiff].... On[e] method by which a plaintiff can show pretext is by demonstrating they were treated differently from similarly situated employees who are not part of the protected class."). Knox admits in his Affidavit that he was terminated for causing a sprinkler system to go off by using a kerosene heater, but contends that he only used the kerosene heater due to unreasonable and reckless time demands placed on him by Mulgrew. Pl.'s App. at 120–21. Knox claims that Mulgrew "was not short of patience with younger employees," and expresses his "belie[f] that the reason I was terminated was primarily because of my age and not solely because the events cited for my termination on January 15, 2010." *Id.* at 121. Knox states that, based upon his experiences with Mulgrew, "Mulgrew was looking for a reason to discharge me because I was viewed as too old," and that Mulgrew used the sprinklers going off as "a justification to disguise the age-based reason for my discharge." *Id.*

Like Knox, Welton admits in his Affidavit the acts that Defendant cited as the basis for terminating him—operating a mower without proper use of safety equipment. *Id.* at 123–24. Welton claims, however, that this was "not the first occasion the company had appeared to be looking for reasons to terminate me or punish me for either petty or non-existent reasons." *Id.* at 124. He claims that just a week prior to his termination, he was "written up for knocking the rollers off of a very old door which had been more seriously damaged by many of my younger predecessors without any discipline." *Id.* Welton claims that another example of disparate treatment is the fact that he was written up by Mulgrew for causing an accident that he did not, and could not have, caused, whereas "Bill Davis, who is substantially younger than me was involved in breaking a pair of windows while operating equipment—to my knowledge he was not even reprimanded—while I was terminated for not having a safety belt on." *Id.* at 125. Welton concludes that the "reason I was terminated was primarily because of my age and not solely because the events cited for my termination on January 15, 2010," noting that "Mulgrew was looking for a reason to discharge me because I was viewed as too old." *Id.*

 While it is true that Plaintiff can support his claim of a discriminatory animus by demonstrating that similarly situated younger employees were treated more favorably than older employees, *see Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 835 (8th Cir.2002), Knox and Welton's statements do not raise a genuine issue of material fact as to disparate treatment. A comparator will only be deemed "similarly situated" where such individual "is similarly situated in all relevant respects," *id.*, *i.e.*, where the comparator "dealt with the same supervisor, [was] subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Cherry v. Ritenour*

*Sch. Dist.*, 361 F.3d 474, 479 (8th Cir.2004). "At the pretextual stage of the analysis, the test for determining whether employees are similarly situated is a rigorous one." *Johnson v. Univ. of Iowa,* 431 F.3d 325, 330 (8th Cir.2005) (quotations and citations omitted). Here, Knox does not even identify any particular younger employee that was treated more favorably than was he, let alone provide sufficient information to determine that such a comparator was subject to the same standards or engaged in the same conduct with no mitigating or distinguishing circumstances. Likewise, while Welton baldly states his belief that Bill Davis, an employee "substantially younger" than him, was not disciplined for breaking a pair of windows, Welton does not provide sufficient information from which to conclude that Davis was, in fact, sufficiently younger than Welton to draw an adverse inference, or that Davis was in a comparable position to Welton, or had no mitigating or distinguishing characteristics.[21][22]

 Plaintiff further posits that Harris's statement that Plaintiff "didn't fit into the scheme, the direction the company was headed" accompanied by Thill's reference to a "culture change" under the new plant ownership constitutes "substantial evidence that the Defendant's actual reason for the Plaintiff's discharge was on the basis of his age." Pl.'s Br. at 22. "Another indication of this 'culture change' working against individuals of Ridout's age was the fact that after receiving regular annual reviews indicating he had at a minimum 'met expectations' on his job performance, his last years at the plant showed there had been no reviews conducted." *Id.* Plaintiff offers no argument or explanation as to how the company experiencing a "culture change" or "heading in a new direction" implies a bias toward older employees.[23] Indeed, even if such comments could be so construed, they are still so innocuous that they cannot be said to "directly reflect[ ][an] alleged discriminatory attitude ... [that] was more likely than not a motivating [or determinative] factor in the employer's decision." *Gagnon v. Sprint Corp.*, 284 F.3d 839, 848 (8th Cir. 2002). Moreover, statements that do not, on their face, reflect a discriminatory attitude, or that are otherwise vague, ambiguous, or isolated, have consistently been held insufficient to support a finding of age discrimination. *See e.g. Merrick v. Farmers Ins. Group,* 892 F.2d 1434, 1438 (9th Cir.1990) ("stray remarks" insufficient to establish discrimination); *Gagne v. North-*

---

**21.** Plaintiff also appears to rely on his own belief that he was terminated on the basis of his age or treated less favorably because of his age, but does not provide any specific examples as to how he was treated differently than similarly situated comparators. Indeed, Plaintiff does not identify any younger employee that was treated differently than was he.

**22.** The Court notes that, at first blush, Defendant's termination of three employees in their sixties appears suspicious. Though neither party discusses the document in their briefs, Plaintiff has provided the Court with a five page list of employees Defendant terminated between July 8, 2009 and July 28, 2010, almost all for "Violation of Policy/Misconduct." Pl.'s App. at 115–19. In this document, ap-

proximately 90 terminated employees are listed, but of those 90, only 33 were age forty or over. While this exhibit means little without additional knowledge of the overall makeup of Defendant's workforce or the precise reasons for each employee's termination, it does make clear that the "big picture" of Defendant's termination practices is likely different than it may appear based on Plaintiff's pleadings.

**23.** The Court recognizes that, though used frequently in employee terminations, phrases such as "heading in a new direction" and "experiencing a culture change" are little more than meaningless cliches that do little, if anything, to aid an employee in understanding the basis for his or her termination.

*western Nat. Ins. Co.*, 881 F.2d 309, 314 (6th Cir.1989) (isolated remarks by plaintiff's supervisor that he "needed younger blood" insufficient to create issue of material fact to defeat summary judgment motion). Likewise, Plaintiff has offered no argument or case law that would support a conclusion that Defendant's failure to conduct performance reviews is indicative of age discrimination. Finally, while Defendant's judgment in terminating Plaintiff and in selecting his replacement may be questionable, it is insufficient to sustain a claim for age-discrimination given the well-established rule that the "employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involved intentional discrimination." *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995) (quotations and citations omitted).

In short, even when the Court assumes Defendant's stated reasons for Plaintiff's termination are pretextual, Plaintiff has still failed to present sufficient evidence, even when viewed cumulatively, that the actual reason for his termination was unlawful discrimination. *See Tuttle v. Missouri Dep't of Agric.*, 172 F.3d 1025, 1030–31 (8th Cir.1999) ("[A plaintiff's] speculation regarding the reasons for his termination, without more, will not suffice to support a reasonable inference of age discrimination."). Indeed, the evidence that age played *any* role in Plaintiff's termination is insufficient whether using the "determinative factor" test under the ADEA, or whether using the "motivating factor" test under ICRA.

## IV. CONCLUSION

The present case presents a classic example of the harshness of the at-will employment doctrine.[24] There can be little doubt that Defendant would not have achieved its successes without the labor of employees like Plaintiff, who by all appearances was a loyal and dedicated worker for Defendant and its predecessors for well over forty years. In light of his extensive history with the plant and the seemingly isolated nature of any misconduct, Defendant's decision to terminate Plaintiff seems to the Court a poor one. Regardless, the Court's task in the present case is not to opine on the wisdom of Defendant's decision; rather, the Court is charged with determining, from the evidence presented, whether a reasonable jury could find that Defendant's decision to terminate Plaintiff was motivated or determined by unlawful considerations. On the present record, no reasonable jury could so find. Accordingly, for the reasons stated herein, Defendant's Motion for Summary Judgment (Clerk's No. 16) is GRANTED.

IT IS SO ORDERED.

---

**24.** *See Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859, 877–78 (Mo.Ct.App.1985) ("As many of the decided cases illustrate, the burden of the at-will employment doctrine seems to be falling most heavily and harshly upon professional and upper and middle level employees. They have the least protection. Most are at-will employees and few have job security through union or individually negotiated contracts. They have the most to lose, frequently being the long-term employees who have the greatest responsibility and substantial investment in and the highest expectations from their careers. Often they are at an age when replacement of their life and medical insurance programs and their retirement plans are difficult or impossible.").